Eugene M. ROMAH and Mary Lou Romah, His Wife, Appellants,

v.

HYGIENIC SANITATION COMPANY, a Corporation and the Dow Chemical Company, a Corporation, Appellees.

Superior Court of Pennsylvania.

Argued Dec. 18, 1996.

Filed Nov. 12, 1997.

Reargument Denied Jan. 26, 1998.

Thomas M. Castello, Pittsburgh, for appellants.

---

James A. McGovern, Pittsburgh, for Hygienic, appellee.

George E. Yokitis, Pittsburgh, for Dow Chemical, appellee.

Before DEL SOLE, POPOVICH and HESTER, JJ.

POPOVICH, Judge:

This is an appeal from the summary judgments entered in favor of appellees, Hygienic Sanitation Company and The Dow Chemical Company. Herein, we are presented with a question of first impression in this Commonwealth. Whether state tort claims are preempted by the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C.A. § 136, *et seq.* Upon review, we affirm the summary judgment entered in favor of Hygienic. However, we affirm only in part the summary judgment entered in favor of Dow, reverse in part and remand for trial in accordance with the provisions of this opinion.

Herein, appellants, Eugene and Mary Lou Romah, raise two questions for our consideration. First, the Romahs ask whether the lower court committed an error of law when it determined the Federal Insecticide, Fungicide and Rodenticide Act preempted appellants' tort claims. Second, appellants question whether the lower court abused its discretion in denying their motion for leave to amend their complaint to include strict liability claims and a claim for punitive damages after they learned that Dow concealed information relevant to the dangerously defective condition of its insecticide from them, the general public and the Environmental Protection Agency.

On December 30, 1987, Eugene and Mary Lou Romah filed a complaint against Hygienic and Dow in which they alleged that Eugene Romah suffered numerous severe and permanent injuries, including *inter alia*, aplastic anemia and other blood disorders, damage to his nervous system, respiratory problems, partial paralysis and headaches.[1] The Romahs contend that Eugene Romah's injuries were caused by his long-term expo-

---

1. Mary Lou Romah's damages are based upon her loss of consortium and medical expenses to treat her husband.

sure to the pesticide Dursban 2E. From 1981 through 1986, Hygienic used Dursban to spray the bar, kitchen and back room area of Gene's Bar, which was owned and operated by Eugene Romah. Dow is the manufacturer and distributor of Dursban.

In their complaint, the Romahs alleged that Hygienic was negligent:

a) in spraying the Dursban 2E in, around, about and near the area frequented by the husband Plaintiff;

b) in dispensing a highly toxic compound in the area frequented by the husband Plaintiff;

c) in failing to warn the husband Plaintiff of the toxic propensities of the compound;

d) in failing to provide husband Plaintiff with the warning labels or other materials designed to inform users or persons exposed to the compound or its dangerous propensities;

e) in failing to use the compound in designated amounts or solutions;

f) in spraying the compound in and around areas which the Defendant knew or should have known would expose husband Plaintiff to direct contact with the compound;

g) in dispensing a toxic substance in an area where food and beverages were served, thereby contaminating the food and beverages, which husband Plaintiff consumed over a period of time;

h) in polluting the air which husband Plaintiff breathed by spraying the compound in and around the area frequented by husband Plaintiff;

i) in failing to conform to laws, regulations and directives of the State and Federal Environmental Protection Agencies regarding the dispensing of the toxic compounds;

j) in failing to conform to the laws, regulation and directives of the United States Department of Labor and Industry regarding the dispensing of toxic compounds;

k) in failing to spray or otherwise dispense the compound at times when it was less likely that husband Plaintiff would be exposed to the toxic compound;

l) in failing to use equipment and material and dispensers which would prevent exposure of husband Plaintiff to the product;

m) in failing to use compounds which are less likely to cause the toxic poisoning suffered by husband Plaintiff;

n) in failing to read, follow and implement instructions on the use of Dursban 2E, and to advise, train and instruct its employees in the proper use of the compound.

Complaint, ¶ 6.

More importantly, in their complaint, the Romahs alleged that Dow was negligent in manufacturing, distributing, selling and ultimately exposing Eugene Romah to Dursban, and in particular:

a) in providing a toxic compound to Defendant "Hygenic" (sic) for distribution to the husband Plaintiff's place of business;

b) in failing to warn husband Plaintiff of the dangerous propensities of the compound, Dursban 2E;

c) in failing to provide husband Plaintiff with warning labels, or other materials designed to inform users or other persons who might be exposed to the compound of its dangerous propensities;

d) in failing to inform, supervise, or train buyers of the compound in the proper use of said compound, and to inform "Hygenic" (sic) of the dangerous propensities of the compound;

e) in failing to conform to the laws, regulations and directives of the State and Federal Environmental Protection Agencies regarding the dispensing of toxic compounds;

f) in failing to conform to the laws, regulation and directives of the United States Department of Labor and Industry regarding the dispensing of toxic compounds;

g) in manufacturing, distributing and selling a highly toxic compound which Defendant "Dow" knew or should have known would be distributed to the general public and to husband Plaintiff in particular;

h) in failing to properly research, follow-up, and otherwise determine what injurious effects the compound had caused to members of the public so as to warn the husband Plaintiff;

i) in failing to provide warnings, or other designations on the product, and instructing users of the product in ways to prevent harm to the husband Plaintiff;

j) in manufacturing a compound, which has combined ingredients, which interact on each other to create a dangerous compound, which is highly toxic, and not fit for distribution to the general public, and husband Plaintiff in particular;

k) in failing to maintain the high standard of care required of manufacturers of toxic substances, in the manufacture, storage, transportation, sale and use of the compound Dursban 2E.

Complaint, ¶ 12.

Hygienic answered the Romahs' complaint and denied it acted in a negligent manner. In its new matter, Hygienic set forth various affirmative defenses, including the statute of limitations, assumption of the risk and contributory negligence. Hygienic also alleged that it neither knew nor should have known that the product posed an unreasonable or foreseeable risk of harm to Eugene, given the prevailing state of medical, scientific and industry knowledge. Finally, Hygienic crossclaimed against Dow, to which Dow responded that they had not acted in a negligent manner.

Dow also answered the Romah's complaint and generally denied it was negligent in any fashion in the manufacture, distribution or sale of Dursban and specifically denied each of the Romahs' specific allegations. In Dow's new matter, it also raised the affirmative defenses of the statute of limitations, assumption of the risk and contributory negligence. Dow also averred that the state of medical and scientific knowledge about Dursban was such that Dow neither knew nor should have known that the insecticide presented a foreseeable risk of harm to Eugene in the normal and accepted use of the product. Further, Dow asserted the "Bulk Supplier" and "Sophisticated User" defenses. Dow also crossclaimed against Hygienic.

For the next six and one-half years, the parties engaged in extensive discovery and litigation of various motions which are not essential to our analysis. The next important event, for our purposes, took place on June 6, 1994, and June 20, 1994, when the Romahs filed an amended complaint and a motion for leave to file an amended complaint. In their motion for leave to file an amended complaint, the Romahs alleged that through the facts and circumstances developed during pre-trial discovery, they believed they are entitled to a strict liability count against both Hygienic and Dow and a punitive damages claim against Dow alone.

Specifically, Romahs asked to amend their complaint against Hygienic to include the following averment to ¶ 6:

o) the Plaintiffs rely upon the averments previously mentioned, and therefore avail themselves of the Doctrine of Strict Liability, as contained in the Restatement of Torts, and the various common law cases, and statutes pertinent thereto and applicable hereto.

They also sought to amend their complaint against Dow to include the exact same averment as ¶ 12(1).

In addition, the Romahs sought to include two punitive damages claims against Dow, one for Eugene and one for Mary Lou. As a factual basis for their punitive damages claims, the Romahs alleged that Dow intentionally concealed test results from 1964 which indicated significantly greater blood cell depression in male rats than female rats. The Romahs contend that after the 1964 test, Dow tested its product on female rats only and did not perform follow-up testing to ascertain the full effects and harmful results to animals and humans.

The Romahs also averred that in 1972, Dow tested the effects of Dursban on prison inmates which indicated significant blood cell depression in humans. The Romahs state that Dow did not report the results to them, did not publish these results on the Dursban warning label and did not submit any reports concerning blood cell depression to the Environmental Protection Agency. The Romahs, thus, argue that Dow's actions amount to fraud, concealment and misrepresentation of material scientific facts (i.e., blood cell depression in humans) on Dursban's warning label. Of course, this is relevant to the present cause of action since Eugene allegedly

suffers from aplastic anemia which is an acute form of blood cell depression. See, Amended Complaint, ¶¶ 18–23.

Thus, the Romahs sought to amend their complaint to include the following averments:

24. The gross and wanton negligence of defendant, DOW CHEMICAL COMPANY, consisted generally as mentioned in paragraphs 18 through 24, and more particularly as follows:

a) in manipulating scientific test results in animals, so as to conceal blood cell depression results;

b) in failing to publish and place on warning labels the blood cell depression found in human testing conducted by DOW CHEMICAL;

c) in failing to report blood cell depression to the Environmental Protection Agency;

d) in testing only female rats to obtain lower blood cell depression results, when DOW knew by its own scientific findings that males rats produced greater blood cell depression;

e) in failing to conduct further testing over longer periods of time, or with greater amounts of Dursban to follow up on the known propensity of Dursban to cause blood cell depression in animals and humans;

f) in otherwise failing to advise the Plaintiff of the dangerous propensities of Dursban, and in particular, the propensity to cause blood cell depression.

Amended Complaint, ¶ 24.

Both Hygienic and Dow replied to the Romahs' motion for leave to amend and argued that the strict liability claim was barred by the applicable two-year statute of limitations, given over six years had passed since they filed their complaint. Dow also averred that it had not acted in a gross, wanton or willful manner and argued that the punitive damages claim was also time-barred. Further, Dow contended that the motion should be denied since the claim is preempted by the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"). On February 3, 1995, the Romahs' motion to amend was denied by the court without explanation.

Additional discovery and litigation which is not relevant to our inquiry took place for the next eighteen months.[2] On January 29, 1996, Dow filed a motion *in limine* to exclude all evidence of plaintiffs' claims against Dow. Therein, Dow averred that all of the Romahs' common law claims were preempted by the FIFRA and, as such, all evidence related to those claims was irrelevant and inadmissible. Specifically, Dow cited to 7 U.C.S. § 136v which, in pertinent part, provides:

(a) In general

A state may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such state shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

Since the Romahs' claims would require a court to determine whether Dow provided adequate warnings concerning the risks of Dursban, Dow, citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), argued that the claims were preempted by the FIFRA.

Under the provisions of the FIFRA, the EPA approves a warning label and authorizes the marketing of a pesticide following an extensive array of tests, including oral, dermal, inhalation, neuro-toxicity, oncogenicity, teratogenicity, reproduction and mutagenicity studies. See, 40 C.F.R. § 158.340. The test results must be submitted to the EPA for evaluation and approved prior to registration of the insecticide for sale. 7 U.S.C. § 136a(c)(2)(A). Only after determining there is not an "unreasonable risk to man or the environment, taking into account economic, social and environmental costs and benefits of the use of any pesticide," does the EPA issue a label and authorize the sale of the product. 7 U.S.C. §§ 136(bb) and 136a(c)(5). Since Dow complied with these requirements for the testing, manufacture

2. On June 2, 1995, the parties stipulated that discovery was closed.

and sale of Dursban, it argued preemption of state tort claims by the FIFRA, since recovery on the Romahs' claims would have the practical effect of requiring additional warning and labelling requirements.

Hygienic filed a similar motion *in limine*.[3] In response to the motions *in limine* based upon the preemption provision of FIFRA, the Romahs argued that the preemption provision did not apply because Dow did not comply with its provisions in its application process, i.e., Dow fraudulently concealed negative test results during the application process. Thus, the Romahs argued that they do not seek to impose additional warnings or labelling requirements, but rather, merely seek to enforce the existing labelling requirements of the FIFRA.

On May 15, 1996, the lower court entered the following order:

AND NOW, to-wit, this 10th day of May, 1996, this Court finds that the issues in this case concerning federal preemption under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 *et seq.* and the granting of defendants' Motion in Limine involve a controlling question of law, as to which there is substantial ground for difference of opinion and immediate appeal from this Order may materially advance the ultimate termination of the matter.

Summary judgments on *all of the Romahs' claims* were thereafter entered on June 11, 1996, in favor of Hygienic and Dow, and the Romahs filed this timely appeal.

The law governing summary judgment is well-settled as set forth in *Sadtler v. Jackson–Cross Co.*, 402 Pa.Super. 492, 587 A.2d 727 (1991):

Summary judgment may properly be entered only if "the pleadings, depositions, answers to depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.C.P. 1035(b). The moving party has the burden of persuading the court that no genuine

issues exist as to the material facts. Summary judgment may be entered only where the case is free from doubt. *Hower v. Whitmak Associates*, 371 Pa.Super. 443, 445, 538 A.2d 524, 525 (1988), *allocatur denied*, 522 Pa. 584, 559 A.2d 527 (1989). In passing upon a motion for summary judgment, moreover, a court must examine the record in the light most favorable to the nonmoving party. Any doubt must be resolved against the moving party. *French v. United Parcel Service*, 377 Pa.Super. 366, 371, 547 A.2d 411, 414 (1988); *Thorsen v. Iron and Glass Bank*, 328 Pa.Super. 135, 140–141, 476 A.2d 928, 930 (1984); *Chorba v. Davlisa Enterprises, Inc.*, 303 Pa.Super. 497, 500, 450 A.2d 36, 38 (1982).

*Laventhol & Horwath v. Dependable Ins. Associates, Inc.*, 396 Pa.Super. 553, 558, 579 A.2d 388, 390 (1990).

As previously stated, the Romahs ask whether the lower court committed an error of law when it determined the Federal Insecticide, Fungicide and Rodenticide Act preempted their tort claim since the label for the insecticide in question was issued on the basis of inadequate testing, fraud and/or misrepresentation by Dow. The doctrine of federal preemption as applied to the FIFRA has been a much litigated issue before and since the United States Supreme Court's decision in *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Our analysis of the issue of preemption will focus upon those cases which post-date *Cipollone, supra*, as that case has altered the preemption analysis. Despite the extensive litigation, the body of law surrounding the question of whether some or all state common law actions are preempted by the FIFRA remains an unsettled issue, as the following analysis reveals. *See*, Stephen D. Otero, Note, *The Case Against FIFRA Preemption: Reconciling Cipollone's Preemption Approach with Both the Supremacy Clause and Basic Notions of Federalism*, 36 Wm. & Mary L.Rev. 783, 810–811 (1995).

During our review of the relevant post-*Cipollone* case law, we find guidance in

---

3. Although this motion does not appear in the record, the Romahs' exceptions to it do.

Chief Judge Eslen's opinion in *Burt v. Fumigation Service and Supply, Inc.*, 926 F.Supp. 624 (W.D.Michigan 1996), and now quote therefrom:

> The doctrine of federal pre-emption is founded on the Supremacy Clause, United States Constitution art. VI, cl. 2. Federal laws are the supreme law of the land; thus, any "state law that conflicts with the federal law is 'without effect.'" See *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992) (citation omitted).

A state law is pre-empted when: 1) Congress expresses a clear intent to preempt state law; 2) when there is an outright or actual conflict between the federal and the state law; 3) when compliance with the federal and state law is effectively impossible; 4) where there is an implicit federal barrier to state regulation; 5) where Congress has occupied the entire field of regulation; 6) where state law "stands as an obstacle" to the objectives of Congress. *Louisiana Public Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986) (citations omitted). The key question is whether Congress intended to pre-empt state law. Congressional intent may be express or implied:

> Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose.... In the absence of an express congressional command, state law is preempted if that law actually conflicts with federal law ..., or if federal law so thoroughly occupies a legislative field "'as to make reasonable the inference that Congress left no room for the States to supplement it.'"

*Cipollone*, 505 U.S. at 516, 112 S.Ct. at 2617. "Absent express pre-emption, courts are not to infer pre-emption lightly, particularly in areas traditionally of core concern to the states such as tort law." *Burke v. Dow Chemical Co.*, 797 F.Supp. 1128, 1136 (S.D.N.Y.1992) (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). This is because the pre-emption doctrine presumes that police powers historically left to the states are not supplanted by federal law. *Cipollone*, 505 U.S. at 516, 112 S.Ct. at 2617.

[Defendant] contends that FIFRA contains an express pre-emption provision codified at 7 U.S.C. § 136v which precludes consideration of plaintiffs' causes of action. Seven U.S.C. § 136v provides in part:

> (a) In general
> A state may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.
> (b) Uniformity
> Such state shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

In *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 613, 111 S.Ct. 2476, 2485–86, 115 L.Ed.2d 532 (1991), the Supreme Court noted that § 136v was an express pre-emption provision. The provision supported the Court's finding that FIFRA did not pre-empt the entire field of pesticide regulation, for § 136v indicated an intent to pre-empt only some aspects of pesticide regulation. *Id.* The Court went on to hold that FIFRA does not expressly or impliedly pre-empt local government use permit regulations. The precise scope of § 136v, including whether § 136v pre-empts common law causes of action, was left for the lower courts to resolve.

Since the Supreme Court's opinion in *Cipollone*, a case dealing with the Public Health Cigarette Smoking Act (PHCSA), 15 U.S.C. § 1331–1340, the majority of decisions interpreting FIFRA hold that § 136v expressly pre-empts some common law causes of action. See, e.g., *Reutzel v. Spartan Chemical Co.*, 903 F. Supp. 1272, 1280 (N.D.Iowa 1995) (citing a litany of cases throughout the federal circuits). In *Cipollone*, the plaintiff filed a state com-

mon law tort action against cigarette manufacturers for failure to warn consumers of the hazards of smoking. The defendant cigarette manufacturers contended that the PHCSA pre-empted the state law claims. That is, Congress intended even common law claims for damages to be pre-empted.

Section 1334(b) of the PHCSA provides that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." A plurality of the Supreme Court held that "[t]he phrase no 'requirement of prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." *Cipollone*, 505 U.S. at 522, 112 S.Ct. at 2620. Therefore, some of the plaintiff's claims were expressly preempted. The plurality then set forth a test to determine the scope of a statute's pre-emptive effect: "[W]e ask whether the legal duty that is the predicate of the common law damages action constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion,' giving that clause a fair but narrow reading." *Id.* at 524–25, 112 S.Ct. at 2621–22.

Turning to § 136v of FIFRA, federal courts uniformly hold that subsection (b)'s "not . . . any [state] requirement" language indicates pre-emption of some state common law actions just as *Cipollone* found the PHCSA's "no [state] requirement" indicates preemption of some state common law actions. That is, "not any" means the same thing as "no," and "requirement" includes state common law damages actions. See, e.g., *Welchert v. American Cyanamid, Inc.*, 59 F.3d 69, 72 (8th Cir. 1995); *Taylor AG Industries v. Pure–Gro*, 54 F.3d 555, 560 (9th Cir.1995); *Mac-Donald v. Monsanto, Co.*, 27 F.3d 1021, 1025 (5th Cir.1994); *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747–48 (4th Cir.1993) ("*Worm II*"); *King v. E.I. Du-Pont De Nemours and Co.*, 996 F.2d 1346 (1st Cir.), cert. dismissed, 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 371 (7th Cir.1993); *Papas v. Upjohn Co.*, 985 F.2d 516, 518 (11th Cir.) (*Papas II*), cert. denied, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir.), cert. denied, 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993). The Sixth Circuit has not yet addressed the question. This Court finds much of the language in the FIFRA effectively indistinguishable from that in the PHCSA.

The remaining question is which of plaintiff's claims are pre-empted by § 136v. Under *Cipollone*, this Court must give the pre-emption provision "a fair but narrow reading." *Cipollone*, 505 U.S. at 524, 112 S.Ct. at 2621. The plain terms of § 136v limit pre-emption to state "requirements for labelling and packaging in addition to or different from" FIFRA's. The legislative history reiterates a Congressional intent to deprive states only of authority related to packaging and labelling:

> In dividing the responsibility between State and Federal Government for the management of an effective pesticide program, the Committee has adopted language which is intended to completely preempt State authority in regard to labelling and packaging. . . . In the case of 'restricted use' pesticides the States are left free to impose whatever restrictions they may wish (other than labelling and packaging). The States could also completely prohibit the use of these 're-stricted use' pesticides within their jurisdictions.

H.R.Rep. 92–511, 92d Cong., 1st Sess. 16 (1971). It was Congress' intent to pre-empt "any State labelling or packaging requirements differing from such requirements under the Act." S.Rep. 92–838, 92d Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 3993, at 4021.

Hence, FIFRA pre-empts "any state common law cause of action that rests on an alleged failure to warn or convey infor-

mation about a product through its label." *In re DuPont–Benlate Litigation*, 859 F.Supp. 619, 622 (D.Puerto Rico 1994) (citing *King*, 996 F.2d at 1349); *Worm II*, 5 F.3d at 747; *Shaw*, 994 F.2d at 371; *Papas II*, 985 F.2d at 518; *Arkansas–Platte & Gulf Partnership*, 981 F.2d at 1179. But claims unrelated to labelling, such as those founded on the testing, manufacture or formulation of the pesticide are not preempted. See *Worm II*, 5 F.3d at 747. See also *Wright v. Dow Chem. Co.*, 845 F.Supp. 503, 510 (M.D.Tenn.1993); *Hurt v. Dow Chem. Co.*, 759 F.Supp. 556, 560 (E.D.Mo. 1990); *Kennan v. Dow Chem. Co.*, 717 F.Supp. 799, 812 (M.D.Fla.1989). This follows from the language and legislative history.

\* \* \* \* \* \*

For circumstances where it is not clear whether the claim is pre-empted as related to labelling, the courts have devised a simple test. The primary means for determining the line between a pre-empted claim and a permissible claim, is "whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or the label." *Worm II*, 5 F.3d at 747–48. See also, *Hue v. Farmboy Spray Co.*, 127 Wash.2d 67, 896 P.2d 682 (1995); *Clubine v. American Cyanamid Co.*, 534 N.W.2d 385 (Iowa 1995); *Jenkins v. Amchem Prods., Inc.*, 256 Kan. 602, 886 P.2d 869 (1994), cert. denied, 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995).

*Burt*, 926 F.Supp. at 628–630. *See also, Lowe v. Sporicidin Intern.*, 47 F.3d 124 (4th Cir.1995); *Bice v. Leslie's Poolmart, Inc.*, 39 F.3d 887 (8th Cir.1994); *Kuiper v. American Cyanamid Co.*, 913 F.Supp. 1236 (E.D.Wis. 1996), *Miller v. E.I. DuPont de Nemours and Co.*, 880 F.Supp. 474 (S.D.Miss.1994).

Since the decision in *Cipollone, supra*, and the opinion in *Burt, supra*, the Supreme Court again addressed the issue of federal preemption in the case of *Medtronic v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). Therein, the Supreme Court re-viewed the preemptive effect of section 360k(a) of the Medical Device Amendments (MDA) to the Food, Drug and Cosmetics Act, 21 U.S.C. § 360k(a) (1988).[4]

Our Supreme Court recently analyzed and applied *Medtronic, supra*, in *Green v. Dolsky*, 546 Pa. 400, 685 A.2d 110 (1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1432, 137 L.Ed.2d 540 (1997), wherein it noted that even though *Medtronic, supra*, also dealt with the preemptive provisions of the MDA, it provided limited guidance because of its different factual and procedural posture. *Green*, 685 A.2d at 117. Our high court, however, did summarize the holding of *Medtronic, supra*, as it applied to the preemption provision of the MDA and the specific facts of *Green, supra*, as follows:

> First, [*Medtronic v.*] *Lohr* teaches that state claims which allege that FDA requirements have not been met are cognizable. Second, if a state cause of action requires proof of additional elements such as negligence or creation of a hazard, these elements are not additional "requirements" within the meaning of § 360(k). Third, manufacturing and labeling claims will not be preempted so long as the federal requirements do not relate to the specific device at issue.

*Green*, 685 A.2d at 117.

■ The Romahs submit that our Supreme Court's analysis and application of *Medtronic, supra*, in *Green, supra*, reveals that our high court has "adopted the view that State claims in and of themselves do not create 'requirements' which would impinge upon the Federal mandate as enunciated in either the MDA or FIFRA." Supplemental Brief of Appellants, p. 3. We must disagree with the Romahs' overly expansive interpretation of *Medtronic, supra*, and *Green, supra*. After review, we conclude that those cases merely clarify the effect of the express preemption provision of the MDA which is quite different than that set forth in the FIFRA. *See, Kuiper v. American Cyanamid Co.*, 960 F.Supp. 1378, 1384 (E.D.Wis.1997)

---

**4.** The MDA preempts a state requirement which "(1) is different from, or in addition to, any requirement applicable under this chapter to the device, *and (2) which relates to the safety or effectiveness of the device....*" 21 U.S.C. § 360k(a) (emphasis added).

(*Kuiper II* ) ("That language [of the MDA] is quite different from the language used in the FIFRA."). Further, we conclude those cases do not limit federal preemption *generally*, but instead direct us to focus upon the specific language of the preemption statute in question when deciding whether state "requirements" are preempted by federal legislation. *O'Donnell v. Big Yank, Inc.*, 696 A.2d 846, 852 (Pa.Super.1997) ("These previous rulings, however, direct us when considering a statutory provision which expressly preempts state law, to look to the precise test to determine the extent to which preemption will apply."). In that sense, our decision today flows directly from and is consistent with the preemption doctrine set forth first in *Cipollone, supra,* followed by *Medtronic, supra,* and applied by our Supreme Court in *Green, supra.*[5]

Thus, our inquiry now turns to the specific allegations of the Romahs' complaint against Dow in relation to the preemption provision of the FIFRA. In their original complaint, the Romahs alleged generally that Dow was negligent in manufacturing, distributing, selling and ultimately exposing Eugene Romah to Dursban. Their claims of negligence can be summarized as follows: 1) Dow was negligent in distributing a toxic chemical (Complaint ¶ 12(a), (k)); 2) Dow was negligent in failing to warn adequately of the dangers of Dursban or properly label Dursban (Complaint, ¶ 12(b), (c), (d), (i)); and 3) Dow was negligent in its manufacture and testing of Dursban (Complaint ¶ 12(g), (h), (j), (k)).[6] In

their amended complaint, the Romahs allege: 1) Dow is strictly liable for failing to warn of the dangerous propensities of Dursban and for negligently manufacturing and testing Dursban; and 2) Dow was grossly negligent when it committed fraud during the EPA pesticide application process by failing to disclose unfavorable test results.

■ Several of the Romahs' negligence claims are clearly preempted by the FIFRA. First, the Romahs claim that Dow was negligent in distributing a toxic chemical is preempted. This is because such a claim would cause the jurors to consider whether the warnings on the label were sufficient to protect the public from injury, a determination which the EPA has already made pursuant to the procedures set forth in the FIFRA. As previously stated, a claim is preempted if "one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter . . . the label." *Burt*, 926 F.Supp. at 630, *quoting Worm II*, 5 F.3d at 747–48. If the Romahs' negligent distribution claim was permitted to go to the jury and the jury concluded that the warnings were inadequate, then such a verdict would have the effect of imposing a new labelling requirement, i.e., Dow would have to warn of the risk of aplastic anemia. Such an outcome is expressly preempted by the FIFRA. *Cf., Pitts v. Dow Chemical Co.*, 859 F.Supp. 543 (M.D.Ala.1994) (counts of product liability

---

**5.** It should be noted that the Supreme Court in *Medtronic, supra,* gave an extremely narrow interpretation to the MDA's preemption provision for two reasons. First, the statute itself, and the federal regulations applicable to the MDA, expressly limited its preemptive effect to those cases where the state "requirement" applies to a particular device for which the FDA has established specific regulations. *Medtronic,* —— U.S. at ——, —— ———, 116 S.Ct. at 2249, 2256–57. Second, the Supreme Court was concerned that giving the term "requirement" its widest possible meaning, would create a much larger preemptive scope for the MDA than that which was given to the PHCSA in *Cipollone, supra,* since under the PHCSA "some common law actions" would not run afoul of the preemption statute, and under the MDA, there is no private cause of action. *Medtronic,* —— U.S. at ——— ———, 116 S.Ct. at 2251–2252; *O'Donnell,* 696 A.2d at 850–52. *See generally, Kuiper II,* 960 F.Supp. at 1383–84 (dis-

tinguishing the MDA preemption provisions as applied in *Medtronic, supra,* from those of the FIFRA).

Nevertheless, we must remember that even under the Supreme Court's extremely narrow interpretation of the preemption provision of the MDA, many common law actions under the MDA remain preempted. *Medtronic,* —— U.S. at ——— ———, 116 S.Ct. at 2256–57; *Green,* 685 A.2d at 117–18 n. 7., 118.

**6.** We are convinced that the Romahs' claim that Dow was negligent in failing to comply with EPA requirements regarding pesticides (Complaint ¶ 12(e)) is essentially the same as its claim, albeit less specific, that Dow was negligent in its manufacture and testing of Dursban, since the manufacture and testing claims as related to the case *sub judice* are governed by the EPA approval process for pesticides.

complaint against manufacturer, distributors and sellers of pesticide which alleged negligence resulting in an inherently dangerous product being made available to the public was preempted because such a claim would call upon the jury to weigh the risks posed by the pesticide against the warnings provided by the label to determine if warnings were sufficient).

█ The Romahs' next set of claims are "expressly-failure-to-warn claims." Basically, the Romahs' claim that Dow was negligent for failing to warn that Dursban causes or increases the risk of blood cell depression, i.e., aplastic anemia. Such a claim is clearly preempted as the Romahs specifically argue that the Dursban warning label is insufficient in its scope. In *Taylor, supra*, the Ninth Circuit Court of Appeals ruled a similar claim, i.e., an allegation that a manufacturer's EPA-approved product label inadequately warned the plaintiff of the hazards associated with the product, was preempted by the FIFRA. In order to prevail on such a claim, the plaintiffs would have to demonstrate that the information on the label was insufficient and a different label was necessary to protect the plaintiffs. The Ninth Circuit held that "[a]warding damages on the [plaintiffs] claim would therefore be tantamount to allowing the state of Arizona to regulate pesticide labelling indirectly, an action which is specifically prohibited by § 136v(b)." *Taylor*, 54 F.3d at 560. Accordingly, the Romahs' claims based upon a failure to warn are preempted. *Cf., Bice*, 39 F.3d at 888; *MacDonald*, 27 F.3d at 1024–25; *Worm II*, 5 F.3d at 747; *King*, 996 F.2d at 1349; *Shaw*, 994 F.2d at 371; *Papas II*, 985 F.2d at 518; *Arkansas–Platte & Gulf Partnership*, 981 F.2d at 1179; *Sowers v. Johnson & Johnson Medical, Inc.*, 867 F.Supp. 306, 312–13 (E.D.Pa.1994); *Kenepp v. American Edwards Laboratories*, 859 F.Supp. 809, 815 (E.D.Pa.1994); *Levesque v. Miles, Inc.*, 816 F.Supp. 61, 69 (D.N.H.1993); *Casper v. E.I.DuPont De Nemours and Co.*, 806 F.Supp. 903, 907 (E.D.Wash.1992); *Didier v. Drexel Chemical Company*, 86 Wash.App. 795, 938 P.2d 364, 368 (1997); *ICI Americas, Inc. v. Banks*, 211 Ga.App. 523, 526–527, 440 S.E.2d 38, 42–43 (1993), *affirmed in part and reversed in part*, 264 Ga. 732, 737, 450 S.E.2d 671, 676 (1994).

█ While the cases, both state and federal, uniformly agree that state claims based upon a failure to warn or inadequate warning labels are preempted by § 136v(b) of the FIFRA, the question of whether a state claim for negligent design, manufacture and testing is preempted by the FIFRA is much less clear. *Compare, Papas II*, 985 F.2d at 519 (claim that manufacturer failed to comply with application process of FIFRA is preempted; claim is for EPA to decide) *with Worm II*, 5 F.3d at 747–48 (state may recognize claim that manufacturer breached FIFRA-created duty which is not related to warnings or labelling). The key to determining whether a negligent design, manufacturing or testing claim is preempted requires the court to determine whether the claim is synonymous with failure to warn. Thus, we must next decide whether the Romahs' claim that Dow negligently manufactured and tested Dursban is really a disguised failure to warn claim.

In *Higgins v. Monsanto Company*, 862 F.Supp. 751 (N.D.N.Y.1994), the District Court was faced with an allegation that the manufacturer did not fully disclose information to the EPA during the application process. In deciding that such a claim was *not* preempted by the FIFRA, the District Court stated:

> The court reiterates that the preemptive scope of FIFRA extends only to claims predicated on failure to warn or inadequate labelling. Defendants argue that a challenge to the adequacy of testing may implicate labelling issues since additional testing might disclose the need for further warnings. The court, however, is unwilling to read FIFRA's preemption so broadly, particularly in light of the presumption against preemption which counsels a narrow construction of preemption provisions. *Cipollone*, 505 U.S. at 517, 112 S.Ct. at 2618; *Florida Lime*, 373 U.S. at 144, 83 S.Ct. at 1218. Instead, the court finds the reasoning of the Fourth and First Circuits persuasive and holds that "claims for negligent testing, manufacturing, and formulating … are not preempted by FIFRA."

*Worm v. American Cyanamid,* 5 F.3d 744, 747 (4th Cir.1993) (emphasis added); *Williams v. State of Louisiana,* 640 So.2d 365, 367 (La.App. 1st Cir.1994); see also *DerGazarian v. Dow Chem.,* 836 F.Supp. 1429, 1447 (W.D.Ark.1993) (FIFRA does not preempt claims for failure to use ordinary care in formulation, inspection, and testing); *Wright v. Dow Chem., U.S.A.,* 845 F.Supp. 503, 507 (M.D.Tenn.1993) (FIFRA does not preempt non-labelling claims for defective design and failure to properly test and study); cf., *Cipollone,* 505 U.S. at 525, 112 S.Ct. at 2622 (Public Health Cigarette Smoking Act of 1969 does not preempt claims that rely solely on testing or research practices).

Plaintiff's second allegation of negligence rests on Defendants' alleged failure to disclose to EPA the known toxic effects of the chemicals in question. Defendants contend that allegation of FIFRA violations are also preempted. In support of this position, Defendants rely primarily on the Eleventh Circuit case of *Papas v. Upjohn Co.,* 985 F.2d 516 (11th Cir.1993) ("*Papas II*"). Defendants reliance on *Papas II* is misplaced.

Although the court in *Papas II* stated, "[w]e think FIFRA leaves states with no authority to police manufacturers' compliance with federal procedures", the court's rationale was limited to allowing an "EPA administrator, not a jury, to determine whether labelling and packaging information is incomplete or inaccurate." *Id.,* at 519 (emphasis added). Therefore, *Papas II* should not be read broadly. Moreover, the Eleventh Circuit later stated in reference to its earlier *Papas I* [*Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991)] decision, that "[o]n remand, this Court took the hint and re-decided the case solely on express preemption grounds." *Myrick v. Freuhauf Corp.,* 13 F.3d 1516, 1522 (11th Cir.1994). The Second Circuit also states that where a court determines that a preemption provision provides a "reliable indicium of congressional intent a court is required to restrict its preemption analysis to the terms of that clause." *Toy Mfrs. of Am. v. Blumenthal,* 986 F.2d 615, 623 (2nd Cir.1993) (preemptive effect of Federal Hazardous Substances Act).

As discussed earlier, the scope of FIFRA's express preemption provision only extends to claims which are predicated on failure to warn or inadequate labelling. *If a plaintiff can establish a violation of FIFRA which is not predicated on failure to warn or inadequate labelling that claim is actionable.* This conclusion finds support in the longstanding statutory canon that cautions "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Silkwood [v. Kerr–McGee Corp.],* 464 U.S. [238] at 251, 104 S.Ct. [615] at 623 [78 L.Ed.2d 443 (1984)]; see also *United Constr. Workers v. Laburnum Constr.,* 347 U.S. 656, 663–64, 74 S.Ct. 833, 836–38, 98 L.Ed. 1025 (1954).

Our decision today echos that of the Fourth Circuit in that, "[i]f a state elects to recognize that a breach of a FIFRA-created duty forms the basis for a state remedy, we have held that it is permitted to do so by 7 U.S.C. § 136v(b)." *Worm,* 5 F.3d at 748. Allowing such actions, however, does not ordain the establishment or enforcement of a common law duty that would impose labelling requirements inconsistent with FIFRA. Rather, *our holding only applies where a plaintiff can establish a violation of FIFRA which is not predicated on failure to warn or inadequate labeling. In this instance, Plaintiff's allegation that Defendants' failed to fully disclose information to EPA meets this requirement, and is thus not preempted.*

*Higgins,* 862 F.Supp. at 758–59 (emphasis added; footnote omitted). See also, *Burt,* 926 F.Supp. at 630 (". . . claims unrelated to labelling, such as those founded on the testing, manufacturing or formulating of the pesticide are not preempted."); *Helms v. Sporicidin International,* 871 F.Supp. 837, 844 (E.D.N.C.1994) (FIFRA does not preempt negligent design, manufacture and testing claims); *Jillson v. Vermont Log Buildings, Inc.,* 857 F.Supp. 985, 991–92 (D.Mass.1994) (claims of negligent design and manufacture do not relate to labelling, but, rather, state is

simply imposing affirmative duty on manufacturers of potentially dangerous products to guard against design or manufacturing defects in their chemicals); *Bingham v. Terminix International Co.*, 850 F.Supp. 516, 521–22 (S.D.Miss.1994) (claims based on failure to test and inspect product adequately for dangers was not preempted by FIFRA); *Eide v. E.I. DuPont De Nemours & Co.*, 542 N.W.2d 769, 772 (S.D.1996) (design defect claim not preempted by FIFRA).

■■■■■ We are persuaded that claims for negligent design, manufacture and testing are not preempted by the FIFRA, provided those claims do not relate to labelling requirements. Our decision to give the preemption provision of the FIFRA a narrow construction is further supported by the United States Supreme Court's decision in *Medtronic, supra*, and our high court's decision in *Green, supra*. While, as previously stated, those cases interpret the preemption provision of the MDA which differs in scope, they nevertheless indicate the intention of both courts to interpret preemption provisions narrowly. Further, both of those cases permit a plaintiff to pursue a private cause of action for a manufacturer's alleged failure to comply with FDA requirements. *Green*, 685 A.2d at 117 (analyzing *Medtronic, supra*). Similarly, we will permit the Romahs to pursue their claim that Dow failed to comply with the EPA requirements, i.e., Dow negligently (or fraudulently) tested Dursban at the time of the FIFRA pesticide registration process.

■■■ Of course, Dow argues, much as Monsanto did in *Higgins*, that a challenge to the adequacy of testing implicates labelling issues since additional testing might disclose the need for further warnings. While it is true that additional warning might be necessary based upon the results of additional testing, we are not convinced that the Romahs' claims for negligent (or fraudulent)

testing are preempted. With regard to this specific claim, Romahs are not *only* alleging that the Dursban label was inadequate based upon the information given during the EPA-approval process. They also seek to enforce the FIFRA's requirement of adequate testing prior to EPA-approval of a pesticide and claim Dow placed a defective product in the stream of commerce by failing to comply with the FIFRA. Complaint, ¶¶ 12(e), (g), (h), (i). Thus, they are not merely seeking to include additional labelling requirements, as is done in the usual failure to warn case. In other words, Romahs do not simply allege that adequate testing would have caused Dow to alter the Dursban label, but, actually, allege that adequate testing and proper design would have caused Dow to alter the product itself so it would be safe. Such a claim is expressly *permitted* under prior decisions. *See, Worm II*, 5 F.3d at 747–48; *Burt*, 926 F.Supp. at 630; *Helms*, 871 F.Supp. at 834–44.[7]

In reaching this decision, we have considered the EPA application process as set forth in the FIFRA. In *Higgins, supra*, the District Court concisely set forth the process as follows:

> In its current form, FIFRA requires that EPA rely on manufacturers for information about the safety of their products. 7 U.S.C. § 136a(c). However, much of the information know to the manufacturer is withheld from the public; indeed, "[t]he production of data to support a pesticide registration is controlled by the registrant, and this data may be withheld from public scrutiny as a trade secret." *Burke*, 797 F.Supp. at 1134 (quoting Tybe A. Brett & Jane E.R. Potter, *Risks to Human Health Associated with Exposure to Pesticides at the Time of Application and the Role of the Courts*, 1 Vill.Envtl.L.J. 355, 363 (1990)).

7. We note, however, to the extent that the Romahs argue Dow was negligent in its manufacture of Dursban because it causes aplastic anemia in certain "hypersensitive" individuals and that information was available to the EPA at the time of registration, we hold that their claim is preempted. Such a claim would be nothing more than a failure to warn claim. *See, Bing-*ham v. Terminix International Co.*, 896 F.Supp. 642 (S.D.Miss.1995) ("*Bingham II*") (claim for "design defect" preempted where plaintiff's expert does not allege product is defective in composition or unreasonably dangerous, since such claim, without such allegations, is merely a failure to warn claim).

Unless alerted by the manufacturer to dangers or the need for special restrictions in the use of the product, it is unlikely that EPA will assume the burden of deciding whether a product should not be sold to the public. *Id.*, at 1135. Although no insecticide may be sold in the United States unless registered with EPA, it is the applicants for registration who are responsible for submitting performance data and draft product labels to EPA. 7 U.S.C. § 136a(a). The degree of specificity that must be submitted depends on the nature of the pesticide and its intended use. See 40 C.F.R. § 158.100–158.740.

\* \* \* \* \* \*

If it appears that a pesticide does not comply with the provisions of the FIFRA, EPA may initiate proceedings to impose use restrictions on, or cancel the registration of, a pesticide. 7 U.S.C. § 136d(b). Whether such limitations should apply depends largely on the information supplied by the manufacturer. Although FIFRA does provide for individuals with standing to petition the EPA to cancel or suspend registrations and also to seek judicial review of EPA decisions under 7 U.S.C. § 136n(a), because consumers will not ordinarily bring such petitions absent a catastrophe or voluntary action by the manufacturer, EPA oversight will not be nearly as protective of persons exposed to pesticides as state tort law. *Burke,* 797 F.Supp. at 1135.

*Higgins,* 862 F.Supp. at 755–56.

Thus, much like the case of *Medtronic, supra,* where the MDA does not provide for private causes of action, the FIFRA does not provide for a meaningful method for the public to challenge the registration of an allegedly defective pesticide or the information upon which pesticide registration is based. Accordingly, like the Supreme Court's narrow interpretation of the preemption provision of the MDA in *Medtronic, supra,* we too apply a narrow reading of the FIFRA preemption provision.

To summarize, we find that the Romahs' claims based upon a failure to warn as set forth above are preempted by the FIFRA, 7 U.S.C. § 136v(b), and, therefore, summary judgment was properly granted as to those claims. Further, we hold that the Romahs' claims that Dow was negligent in its design, manufacture and testing of Dursban is not preempted by the FIFRA, and, accordingly, the lower court committed an error of law when it entered summary judgment as to the Romahs' negligent design, manufacture and testing claims.

This holding is equally applicable to the Romahs' claims for strict liability and their claim that Dow was grossly negligent when it fraudulently concealed testing information from the EPA during the approval process. However, the Romahs did not seek to amend their complaint to include their strict liability count and their claim for punitive damages (gross negligence of Dow) until after the statute of limitations had expired. Thus, we must now determine whether the lower court should have permitted the Romahs to amend their complaint to include claims for strict liability against both Hygienic and Dow and a punitive damages claim (gross negligence) against Dow alone.

Presently, the Romahs allege Eugene Romah has suffered serious physical injuries, most notable aplastic anemia, because of his exposure to Dursban and Mary Lou suffers from loss of consortium. Thus, the statute of limitations applicable to this action is found in the Judicial Code at 42 Pa.C.S.A. § 5524(2), which provides that an action to recover damages for injuries to a person caused by the wrongful act or neglect or negligence of another must be commenced within two years.

The Romahs filed this action on December 30, 1987. Over six and one-half years later, on June 20, 1994, the Romahs asked for leave to amend their complaint to include the additional claims. Dow and Hygienic argue that the Romahs' request is untimely because it seeks to amend their complaint to include additional causes of action after the expiration of the statute of limitations. If we assume *arguendo* that the Romahs filed their suit at the very moment their cause of action accrued, the statute of limitation expired two years from the date of the filing of their complaint. Thus, Dow and Hygienic argue

that the amendment filed some six and one-half years after the complaint was filed is barred by the applicable two-year statute of limitations. In response, the Romahs submit that application of the discovery rule renders their amended complaint timely filed.

 In *Matos v. Rivera*, 436 Pa.Super. 509, 514, 648 A.2d 337, 340 (1994), we stated:

> Pa.R.C.P. 1033 provides that a party, by leave of court, may amend his pleading at any time. "The decision whether to allow a proposed amendment of a pleading is within the sound discretion of the court below, and that decision will not be disturbed on appeal absent an abuse of discretion." *Pastore v. Anjo Construction Company*, 396 Pa.Super. 58, 68, 578 A.2d 21, 27 (1990). There is, however, a prohibition against amendments which add a new cause of action to a complaint after the running of the statute of limitations. "Though the right to amend a pleading is to be constructed liberally, amendment will not be permitted after the running of the statute of limitations if it introduces a new cause of action." *Del Turco v. Peoples Home Savings Association*, 329 Pa.Super. 258, 274, 478 A.2d 456, 464 (1984). A new cause of action arises if "the amendment proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed." *Junk v. East End Fire Department*, 262 Pa.Super. 473, 490–491, 396 A.2d 1269, 1277 (1978).

 In *Krevitz v. City of Philadelphia*, 167 Pa.Cmwlth. 412, 648 A.2d 353, 356–357 (1994), the Commonwealth Court explained the application of the discovery rule when a plaintiff seeks to amend his complaint after the expiration of the two-year statute of limitations, as follows:

> This two year period begins to run "as soon as the right to institute and maintain suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono International Raceway v. Pocono Produce*, 503 Pa. 80, 84, 468 A.2d 468, 471 (1983). A person asserting a claim has the duty to use "all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Id.*

In *Baily v. Lewis*, 763 F.Supp. 802, (E.D.Pa.1991), *affirmed*, 950 F.2d 721 (3d Cir.1991), the court reviewed the standard of reasonable diligence under Pennsylvania law and stated:

> In defining reasonable diligence, the courts have stated "[t]here are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence." *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268, 1273 (3d Cir.1987) (quoting *Deemer v. Weaver*, 324 Pa. 85, 90, 187 A. 215, 217 (1936)). Moreover, with respect to knowledge of a claim, "plaintiffs need not know that they have a cause of action, or that the injury was caused by another party's wrongful conduct, for once a plaintiff possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim." *Vernau v. Vic's Market, Inc.*, 896 F.2d 43, 46 (3d Cir.1990); *accord Citsay v. Reich*, 380 Pa.Super. 366, 370–371, 551 A.2d 1096, 1098 (1988).

*Id.* at 806–07.

In those instances where the plaintiff cannot reasonably be expected to be aware of the injury or of its cause, the discovery rule may apply to toll the running of the statute of limitations. *Id.* The discovery rule is a judicially created device which provides that the limitations period begins to run when "the plaintiff knows or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Redenz by Redenz v. Rosenberg*, 360 Pa.Superior Ct. 430, 434, 520 A.2d 883, 885, *allocatur denied*, 516 Pa. 635, 533 A.2d 93 (1987).

The statute begins to run when the injured party "possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investi-

gate to determine whether he is entitled to redress." *Brunea v. Gustin,* 775 F.Supp. 844, 846 (W.D.Pa.1991), (quoting *Zeleznik v. United States,* 770 F.2d 20, 23 (3d Cir. 1995)).

Pennsylvania law recognizes that fraudulent concealment by the potential defendant can result in the tolling of the statute of limitations. Our Supreme Court has described the fraudulent concealment doctrine as follows:

Where, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry," the defendant is estopped from invoking the bar of the statute of limitations. *Schaffer v. Larzelere,* 410 Pa. 402, 405, 189 A.2d 267, 269 (1963). Moreover, defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient. *Walters v. Ditzler,* 424 Pa. 445, 227 A.2d 833 (1967); *Nesbitt v. Erie Coach Company,* 416 Pa. 89, 204 A.2d 473 (1964). Mere mistake, misunderstanding or lack of knowledge is insufficient however, *Schaffer v. Larzelere, supra;* and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party. *Nesbitt v. Erie Coach Company, supra.*

*Molineux v. Reed,* 516 Pa. 398, 402–403, 532 A.2d 792, 794 (1987).

Further, although mere silence or nondisclosure is not enough to trigger estoppel, the adversary must commit some affirmative independent act of concealment upon which the plaintiffs justifiably rely in order to toll the statute. *Walters;* Dobbs on Remedies § 2.3 at 42.

*See also, Sadtler v. Jackson–Cross Co.,* 402 Pa.Super. 492, 498–501, 587 A.2d 727, 731–732 (1991); *Garcia v. Community Legal Services Corp.,* 362 Pa.Super. 484, 495, 524 A.2d 980, 985 (1987), *appeal denied,* 517 Pa. 623, 538 A.2d 876 (1988); *Med–Mar, Inc. v. Dilworth,* 214 Pa.Super. 402, 407, 257 A.2d 910, 913 (1969).

In order to determine whether the lower court properly denied the Romahs' request to amend their complaint, we must consider the strict liability claims against Hygienic and Dow separately from their punitive damages claims against Dow alone.

Clearly, the lower court did not err when it denied the Romahs' attempt to add the strict liability claims. As is evident from a review of the Romahs' motion for leave to amend their complaint itself, the Romahs did not allege any additional facts in support of their strict liability claims which were not discoverable at the time they filed their complaint over six and one-half years earlier. In fact, their strict liability claims were expressly and solely based upon the averments made in ¶ 1 through ¶¶ 6(a)–(n) (Hygienic) and ¶ 1—12(a)–(k) (Dow), of their original complaint. *See,* Amended Complaint. The Romahs' attempt to toll the statute of limitation via application of the discovery rule must fail in regard to their strict liability claims since those claims are based entirely upon facts known to the Romahs at the time they filed their original complaint.

Since the Romahs' attempt to add new causes of action, i.e., two counts of strict liability, after the expiration of the two-year statute of limitations, we find that those claims are time-barred. *Asper v. Haffley,* 312 Pa.Super. 424, 458 A.2d 1364 (1983) (plaintiff cannot amend complaint based in negligence to include strict liability claim three years after filing of original complaint); *Bendas v. Township of White Deer,* 131 Pa. Cmwlth. 138, 569 A.2d 1000 (1990), *appeal denied,* 526 Pa. 639, 584 A.2d 321 (1990).

The question of whether the Romahs' claims for punitive damages are likewise barred by the two-years statute of limitations is not quite as easily resolved. This is because the Romahs allege that Dow intentionally concealed facts which show that Dursban causes or increases the risk of blood cell depression in males, and the Romahs could not discover this information until July 2, 1993, when Dow finally disclosed it, at which time they sought to amend their complaint in a timely manner. Thus, the Romahs contend the discovery rule (and fraudulent concealment by Dow) operates to toll the statute of

limitations such that their amended complaint for punitive damages is timely.

Specifically, the Romahs allege "Dow concealed numerous facts not only from the Romahs, but also from the public in general and from the Environmental Protection Agency, with the intent to conceal the dangerously defective condition of its product. Accordingly, its concealment estopps [sic] Dow from invoking the statute of limitations." Romahs' Brief, p. 25.[8] In response, Dow notes that the Romahs' fraudulent concealment allegations are based almost entirely upon the results of a study which it had submitted to the EPA in 1964, when it first complied with the FIFRA approval process and, therefore, the discovery rule does not toll the running of the statute of limitations.

To the contrary, in their reply brief, the Romahs specifically argue:

The critical work which exposed Dow's concealment was entitled *Results of 90– Day Dietary Feeding Studies of [0],0–Diethyl 0–3, 5, 6–Trichloro–2 Pyridyl Phosphorothiate in Rats*. R. 9b–25b. In this study, groups of male and female rats were fed derivatives and component parts of Dursban 2E and studied for a 90 day period. R. 90b. General appearance and behavior, growth, food consumption, suriumurea, nitrogen and alkaline phosphatase determinations, final average body and organ weights, and growths and microscopic examination of tissues were performed on both male and female rats. The results of these examination are disclosed on Table I and Tables III through VI of the report. R. 13b, 14b & 16b–19b. Significantly, Table II of this report discloses the hematological values for female rats only. R. 15b. Romahs contend that, based upon the expert testimony of Dr. Edwards and Dr. Winek, Dow's report discloses the hematological values for female rats only. R. 15b. [Dow's] failure to disclose male rats' higher

susceptibility to blood cell depression from exposure to chlorpyrifos, and Dow's exclusion of these tests results from the information produced to the Environmental Protection Agency, constitutes and effort to hide the physical effects caused by Dursban 2E.

In Interrogatory No. 1 of Romahs' Second Set of Interrogatories propounded to Dow, Romahs requested laboratory reports concerning studies on animals involving the product chlorpyrifos including, but not limited to, studies concerning blood chemistries and bone marrow. In its response, Dow objected to the interrogatory and then referred to an attached list identified as Exhibit A, which provides an index of studies conducted. R. 551a. No. 2 on that list is the 90 day dietary study referred to above. When Romahs requested copies of the studies in Dow's possession regardless of whether they were submitted to governmental agencies, Dow objected to the interrogatory by indicated that the information sought was in the public realm and could easily be obtained. (*See* Interrogatory No. 9 of Romah's Second Set of Interrogatories Directed to Dow, R. 559a.) However, as Dr. Edwards testified in a deposition on September 10, 1992 in the *Bainbridge* case, that study was not published so it was not accessible to the general public. R. 409a. This information was received by the Romahs through Dr. Edwards' deposition.

Furthermore, in response to Romahs' Interrogatory No. 10 of their Third Set of Interrogatories Directed to The Dow Chemical Company, Dow stated that it was unaware of any testimony from a medical or scientific source that Dursban 2E had caused aplastic anemia in humans. R. 579a. This interrogatory was answered by Dow on April 16, 1993. However, the deposition of Dr. Edwards in the *Bainbridge* case took place on September 10, 1992,

---

8. In their brief, the Romahs suggest that Dow was grossly negligent when it concealed four studies which showed blood cell depression in rats; submitted a study of the effects of chlorpyrifos to the EPA which did not include the data for male rats which demonstrated a higher susceptibility to blood cell depression; tested only female rats after learning male rats showed

greater susceptibility to blood cell depression; failed to respond to EPA criticism of their study due to the lack of results for male rats; and never conducted a study to determine whether Dursban caused aplastic anemia, despite test results showing blood cell depression in male rats. Romahs' Brief, p. 8.

almost seven months prior to Dow's response. Therefore, as of April, 1993, Dow was attempting to conceal the existence of Dr. Edwards whose testimony was unequivocal and accusatory as to Dow's knowledge of the dangerous propensities of Dursban 2E and its attempts to conceal them from the Environmental Protection Agency. It was not until Dow filed its Second Supplement Answers to Romahs' Third Set of Interrogatories on July 2, 1993, that Dow acknowledges the deposition testimony of Dr. Edwards (General Docket B–1987, p. 650).

Because the critical study report was not published, Romahs could not have discovered the relevant evidence until they received the documents from Dow. Dow disclosed the existence of Dr. Edwards and his damaging testimony on July 2, 1993. Less than a year later, on June 20, 1994, Romahs filed their motion to amend the complaint.

Romahs' Reply Brief, pp. 3–5.

Further review of the record and the Romahs' brief reveals that their gross negligence claim for punitive damages is based upon four studies promulgated by Dow which allegedly show Dursban caused blood cell depression. Romahs' Brief, p. 8. Those studies include:

1) Results of 90–day Dietary Feeding Studies of 0,0–Diethyl 0–3, 5, 6–Trichloro–2–Pyridyl Phosphorothiate in Rats by S.C. Beatty and D.D. McCollister dated April 5, 1971 (edited from the original report of February 24, 1964). (R.9b–25b);

2) Results of Two–Year Dietary Feeding Studies on DOWCO 179 in Rats by S.B. McCollister, R.J. Gehring and C.G. Humiston dated September 20, 1971. (R. 26b–139b);

3) Chlorpyrifos: 2–Year Dietary Chronic Toxicity–Oncogenicity Study in Fischer–344 Rats by John T. Young and Mark Grandjean dated December 23, 1988. (R. 182b–350b); and

4) Chlorpyrifos: 13–Week Dietary Toxicity Study in Fisher–344 Rats by J.R. Szabo, John T. Young and Mark Grandjean dated December 28, 1988. (R. 351b–411b).

Dow argues that it submitted those studies to the EPA in connection with obtaining and maintaining its registered label for Dursban, and, thus, the reports are a matter of public record. Further, Dow alleges that it provided the Romahs with five of the very documents upon which Dr. Edwards based his conclusion in *Bainbridge v. Bugg–Off Pest Control*, in March of 1991, in their answer to the Romahs' second set of interrogatories. Consequently, Dow contends that at the very latest in March of 1991, the Romahs possessed the salient facts to put them on notice that a wrong had been committed and that they needed to investigate and determine whether they were entitled to redress. *Krevitz*, 648 A.2d at 357.

If Dow's averments are correct, we must agree that the Romahs' allegations of gross negligence and their demand for punitive damages are barred by the two-year statute of limitations. Clearly, if they possessed (or were able to possess through the exercise of reasonable diligence, *see Pocono International Raceway*, 468 A.2d at 471) the very information upon which their claims are based in 1991 and, yet, failed to amend their complaint until June 20, 1994, their claim is time-barred, even if we assume that the time period did not begin to run until Dow provided them with the documents.

Unfortunately, the record itself is less than clear as to whether, much less when, Dow actually provided the Romahs with the studies which form the basis of the Romahs' gross negligence claim. The *reproduced record* indicates that Dow did provide a list of studies related to Dursban in its answers to the Romahs' second set of interrogatories. However, the *official record* does not reveal whether and when Dow provided the requested information to the Romahs since Dow did not file their answers to the Romahs' second set of interrogatories. Thus, from a review of the official record, we cannot tell when or if Dow released the information upon which the Romahs' claim is based. Further, although Dow alleges that the significant studies were filed with the EPA and, thus, are available to the public, the Romahs, to the contrary, allege that the studies upon which their claim of gross negligence is

based are unpublished and not available from the EPA.

Consequently, we must remand this case for an evidentiary hearing to determine whether and/or when the Romahs were provided with or directed to a source of the studies in question by Dow. If the studies are unpublished and not available from the EPA, then the Romahs could not have discovered their "injury" with the exercise of reasonable diligence until Dow actually disclosed their existence. The timing and substance of Dow's disclosure of the studies related to blood cell depression is crucial to determining whether the Romahs' amend complaint is time barred, i.e., whether the Romahs acted with reasonable diligence and whether Dow attempted to conceal the reports at issue. Thus, upon remand, we direct the court to reconsider its denial of the Romahs' motion to amend in accordance with the provisions of this opinion.[9]

Should the court determine that the discovery rule tolled the statute of limitations, then the Romahs may proceed with their gross negligence claim for punitive damages, as well as their claim for negligent design, manufacture and testing of Dursban. If not, then the Romahs' case shall proceed to trial only on those claims in their *original* complaint which are not preempted by the FIFRA.[10]

Summary judgment as to Hygienic Sanitation Company affirmed. Summary judgment

as to Dow Chemical Company affirmed in part and reversed in part. Case remanded for further proceedings in accordance with the provisions of this opinion. Jurisdiction relinquished.

---

**9.** The Romahs, citing *Hilbert v. Roth*, 395 Pa. 270, 149 A.2d 648 (1959), argue that their punitive damages claim is merely derivative of their original negligence cause of action and not a separate and distinct cause of action which may be barred by the statute of limitations. However, *Hilbert, supra*, is inapposite to the case *sub judice*. Rather, the Romahs now attempt to amend their complaint to include a claim for punitive damages based upon an allegation of gross negligence. "A new cause of action does arise ... if the amendment proposes a different theory or a different kind of negligence than the one previously raised or if the operative facts supporting the claim are changed." *Willett v. Evergreen Homes, Inc.*, 407 Pa.Super. 141, 595 A.2d 164, 169, *appeal denied*, 529 Pa. 623, 600 A.2d 539 (1991). In their amended complaint, the Romahs seek to allege something quite different from ordinary negligence. This cannot be done if, upon remand, the lower court concludes that the statute of limitations was not tolled by opera-

tion of the discovery rule. *Cf., Willett*, 595 A.2d at 169.

**10.** We note that the Romahs apparently concede that summary judgment was properly entered against Hygienic since they do not contend anywhere in their brief that summary judgment in favor of Hygienic was erroneously entered. Therefore, the Romahs have waived any attack on the summary judgment entered in Hygienic's favor. *Harvilla v. Delcamp*, 521 Pa. 21, 555 A.2d 763 (1989) (issue included in statement of questions presented was waived for failure to address issue in appellate brief); *Bunt v. Pension Mortg. Associates, Inc.*, 446 Pa.Super. 359, 666 A.2d 1091 (1995) (arguments that are not developed on appeal are waived).

Further, we note that this opinion in no way addresses the legal sufficiency of the Romahs' surviving claims against Dow.